# EXHIBIT A

Krystaly N. Koch (Bar No. 16491)
FREEMAN LOVELL, PLLC
9980 South 300 West, Suite 200
Sandy, Utah 84070
Office: (385) 355-4826
Email: *krystaly.koch@freemanlovell.com*
*Attorneys for Plaintiff*

> If you do not respond to this
> document within applicable time
> limits, judgment could be entered
> against you as requested.

## IN THE BUSINESS AND CHANCERY COURT
## IN AND FOR THE STATE OF UTAH

| | |
|---|---|
| DASHLOGIC, INC, a Utah corporation, | |
| Plaintiff, | **COMPLAINT** |
| vs. | **TIER 3** |
| AUTO METER PRODUCTS, INC., an Illinois corporation; and AMEI HOLDINGS, INC, a Delaware corporation, | Civil No. |
| Defendant. | Judge Rita Cornish |

Plaintiff DashLogic, Inc. by and through undersigned counsel, brings the following

complaint against Defendants Auto Meter Products, Inc. and AMEI Holdings, Inc. (collectively,

"Defendants") and hereby complains and alleges as follows:

## **PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff DashLogic, Inc. (fka Palmer Performance Engineering, Inc.) is a Utah

corporation with its principal place of business in Utah County, Utah ("DashLogic").

2.      Defendant Auto Meter Products, Inc. is a Delaware corporation operating

nationwide (even worldwide), including in Utah County, Utah ("Auto Meter").

3.      Upon information and belief, Defendant AMEI Holdings, Inc. is a Delaware corporation and the owner of Defendant Auto Meter, which operates nationwide (even worldwide), including in Utah County, Utah ("AMEI").

4.      Jurisdiction is proper pursuant to Utah Code Ann. §§ 78A-5a-103, 78A-5-102.

5.      Venue is proper in this Court pursuant to Utah Code Ann. §§ 78B-3a-102, 205 (2), 78B-3-205, and § 78A-5a-105.

6.      This matter is a Tier 3 case under and pursuant to Rule 26(c)(3) of the Utah Rules of Civil Procedure.

## GENERAL ALLEGATIONS

7.      Defendant Auto Meter is a developer and manufacturer of specialty automotive instrumentation systems as well as battery and electrical system test and charging equipment along with other automotive and instrumentation (and related) products.

8.      Upon information and belief, Auto Meter is owned and operated by AMEI (collectively, AMEI and Auto Meter are "AMP").

9.      DashLogic develops, manufactures, and sells automotive diagnostic scan tools, data loggers, sensor control modules, and other software and hardware products, and owns certain related patented technologies and intellectual property (the "Developments").

10.     DashLogic has won multiple awards from SEMA, Diesel Tech, and General Motors, among others.

11.     DashLogic's Developments include vehicle and OBD-II communications chips, interfaces, and related technologies, software and configuration programs including but not

limited to a certain driver information and alerting system, commonly referred to as the DashControl line of products (formerly the DashLogic Display Controller), among other things.

12.     DashControl is a proprietary hardware device built using DashLogic's technology and software with enhanced vehicle diagnostic and monitoring capabilities and provides enhanced performance data.

13.     On or about November 2013, AMP approached DashLogic seeking to acquire the company.

14.     On or about November 2014, the parties began discussing entering into a long-term strategic alliance.

15.     On or about March 30, 2015, the parties entered into a License Agreement (the "Contract").

16.     Pursuant to the Contract, DashLogic would license AMP that certain DashLogic Display Controller, which embodies certain Licensed Patents, Licensed Products, and Licensed Technology, including but not limited to the Driver Information and Alerting System, (collectively the "Licensed Intellectual Property Rights").

17.     The Contract expressly acknowledges that DashLogic owns the Licensed Intellectual Property Rights, and that the grant to AMP to use said rights are limited by the express terms of the Contract. §5.1.

18.     Pursuant to the Contract, AMP agreed that "AMP shall not ... provide any products" that compete with a list of actual or potential future DashLogic products, which list is included in the Contract as Exhibit B (the "Prohibited Items"). Contract. §2.2.

3

19.     The sale of any Prohibited Item by AMP constitutes a material breach of the Contract.

20.     Pursuant to the Contract, Prohibited Items 1 and 2 are On-Board Diagnostics II ("OBD-II") microchips and hardware interfaces that enable connectivity with OBD-II compliant vehicles.

21.     Pursuant to the Contract, Prohibited Item 1 is:

| 1. | Vehicle/OBD-II Communications Chips | This would be an embedded microcontroller chip that can go onto a circuit board to provide vehicle data connectivity. |
|---|---|---|

22.     Prohibited Item 1 includes items that provide OBD-II connectivity, including but not limited to microcontrollers / chips.

23.     Pursuant to the Contract, Prohibited Item 2 is:

| 2. | Vehicle OBD-II & Pass-Thru Communications Hardware Interfaces and Associated SDK/API to access the hardware | This would be a physical product that enables a computing device (PC, tablet, phone, etc.) to access vehicle data. Palmer would need to provide an SDK or API to 3rd parties that wanted to use our hardware to talk to a vehicle and read data. |
|---|---|---|

24.     Prohibited Item 2 includes items that provide interfacing, such as via Bluetooth and/or communications interfaces, from the vehicle to a separate computing device, such as a PC, tablet, phone, etc. (commonly referred to as "Dongles").

25.     Any item that provides OBD-II connectivity, necessarily contains an OBD-II Communication Chip (Prohibited Item 1).

26.     Even items that do not provide interfacing to a separate computing device, such as a PC, table, phone, etc., but still provide OBD-II connectivity, necessarily contain an OBD-II Communication Chip (Prohibited Item 1).

4

27.     AMP provides DashLink II, OBD-II Digital Gauges, which includes AMP part numbers 6035 & 6036 (collectively, the "DashLink Dongle").

28.     The DashLink Dongle enables a computing device, specifically "android and Apple iOS smartphone or tablet mobile devices" to access vehicle data.[1]

29.     The DashLink Dongle's "[e]asy OBDII plug and play installation makes for the fastest performance gauge installation available. DashLink enables you to … transform your Apple iOS or Android enabled device into a customizable display and monitoring system", enabling customers to "Monitor and data log engine and vehicle performance, fuel economy, and instantly read and clear troublesome check engine lights, all with the easy to use plug-n-play functionality of the DashLink II system."[2]

30.     The DashLink Dongle includes an embedded OBD-II microcontroller chip.

31.     AMP manufactures the DashLink Dongle using an embedded OBD-II microcontroller communications chip from DashLogic's competitor.

32.     The DashLink Dongle constitutes both Prohibited Items 1 and 2, and thus violates the terms of the Contract.

33.     By selling and providing the DashLink Dongle, including using the microcontroller communications chip from DashLogic's competitor, AMP is in material breach of the Contract.

34.     AMP originally used DashLogic's OBD-II communications microchip, PCB and CAD designs for the DashLink (part numbers 6035 & 6036) subject to a separate agreement. During

---

[1] https://www.autometer.com/dashlink-ii-obdii-digital-gauges-apple-ios-android.html

[2] Id.

Covid, due to a global shortage of certain materials and long lead times, among other things, AMP chose to create and updated version of the DashLink Dongle, which was supposed to replace the existing Dash Link (part number 6035/6036). DashLogic was told "The idea behind this dongle is to be the 6036 replacement."

35.     When making the DashLink Dongle, AMP asked DashLogic to make printed circuit board changes, and to supply Gerber files, 3D CAD model files, and also design the front decal layout, among other things.

36.     DashLogic actively worked with AMP to perform this work, with the express understanding that AMP would be purchasing these DashLink Dongles from DashLogic, based on DashLogic's DL302 design that it had developed, and pursuant to the terms of the Contract (which requires AMP to source these items from DashLogic).

37.     For example, on or about July 12, 2022, AMP contacted DashLogic and asked them to create a beta app that works with the new DashLink Dongle, based on the DL302 design from DashLogic, and previous dongles.

38.     On or about July 28, 2022, AMP contacted DashLogic and asked for an update on 6 items that DashLogic was working on for the DashLink Dongle: (i) the bill of materials, (ii) PCBA files, including Gerber files and 3D CAD files, (iii) module sub-assembly 3D CAD files, (iv) front decal file, (v) Case CAD files, and (vi) adding new model to the "mfgtool" (which is a DashLogic-developed and owned manufacturing utility to facilitate the production of DashLogic's hardware devices).

39.    On or about July 29, 2022, DashLogic sent the front decal file to Justin Masters (AMP's Instrumentation Engineering Manager) and Dean Panettieri, President and COO of AMP. Justin responded, in writing, approving DashLogic's design.

40.    Importantly, AMP included their purchasing department on certain emails on this subject, further confirming to DashLogic that AMP would be purchasing the DashLink Dongle from DashLogic.

41.    Throughout the process AMP actively communicated with DashLogic about the design of the DashLink Dongle.

42.    On or about August 8th 2022, AMP emailed with DashLogic, checking and confirming details about the DashLink Dongle (specifically regarding component C6 from the Bill of Materials), and DashLogic replied later that same day.

43.    DashLogic also replied to AMP again on August 25th 2022 and confirmed that the design was complete.

44.    Just five days later, on August 30th 2022, Justin Masters of AMP emailed DashLogic, informing DashLogic that AMP had a new manufacturer for the DashLink Dongle.

45.    DashLogic performed the work on the DashLink Dongle, conditioned upon AMP purchasing the DashLink Dongle from DashLogic.

46.    DashLogic relied on the terms of the Contract in its performance of its work on the DashLink Dongle.

47.    DashLogic spent thousands of dollars performing this work and provided AMP these specialized files pursuant to the agreement between the parties (e.g. manufacturable using DashLogic's internal "mfgtool" program, et. al.).

48.     Upon information and belief, AMP prolonged this process in order to find a different supplier for the DashLink Dongle.

49.     AMP then purchased the DashLink Dongle, including the OBD-II communications microcontroller which it contains, from a supplier in China, instead of DashLogic.

50.     AMP then forced DashLogic to make AMP's software compatible with the new Chinese supplied product under a separate consulting agreement dated August 1st 2018 (the "Consulting Agreement").

51.     On or about May 2024, DashLogic sent AMP a formal notice of termination of the Consulting Agreement.

52.     AMP provides CAN Bridge, OBD-II Data Module.

53.     CAN Bridge, OBD-II Data Modules "streamline adding gauges or an InVision LCD dash to OBDII based engine and vehicle platforms... CAN Bridge simply plugs into the diagnostic port and captures the existing sensor data and outputs up to six signals... on your vehicle."[3]

54.     Feature points of the CAN Bridge, OBD-II Data Modules include the ability to "Plug-n-play from OBDII to traditional round AutoMeter short sweep ... gauges..." and that it "[w]orks with most OBD-II applications..."[4]

55.     The CAN Bridge, OBD-II Data Module is also advertised as the "Auto Meter CAN Bridge OBDll Data Interface Module – 9113".[5]

56.     The CAN Bridge, OBD-II Data Module is advertised as an OBD-II interface.

57.     The CAN Bridge, OBD-II Data Module contains an OBD-II Communication Chip.

---

[3] https://www.autometer.com/can-bridge-obd-ii-data-module-for-invision-dash-and-autometer-gauges.html
[4] Id.
[5] https://www.lethalperformance.com/auto-meter-can-bridge-obdll-data-interface-module-9113.html

58.    The CAN Bridge, OBD-II Data Module falls under Prohibited Items 1 and 2.

59.    The CAN Bridge, OBD-II Data Module is advertised as being "purchased with
Signal Splitter / Adapter, OBD II, Product 5323."

60.    This Signal Splitter / Adapter also falls under Prohibited Item 2.[6]

61.    No later than September of 2019, DashLogic introduced their SensorTap P4 to AMP.

62.    On September 20, 2019, DashLogic attended a meeting with AMP to discuss the
SensorTap.

63.    AMP informed DashLogic that they wanted to license and sell the SensorTap.

64.    Thereafter, AMP developed and sold a competing device, the CAN Bridge.

65.    AMP provides the BVA-360, Hand-Held Battery & Electrical System Tester.

66.    The BVA-360, Hand-Held Battery & Electrical System Tester has a battery reset
feature.

67.    The battery reset feature on the BVA-360, Hand-Held Battery & Electrical System
Tester is an OBD-II based reset feature, and requires an OBD-II communications interface
(Prohibited Item 2), including an OBD-II communications microchip (Prohibited Item 1), in order
to function.

68.    The BVA-360, Hand-Held Battery & Electrical System Tester uses DashLogic's
Application Programming Interface (or "DLAPI") to perform these OBD-II features.

69.    DashLogic provided its DLAPI to AMP as source code for use in the BVA-360, to
perform battery reset functions over an OBD-II communications interface, such as the R3,
DashLogic's proposed interface, and otherwise.

---

[6] Signal Splitter / Adapter, OBD II, Product 5323, https://www.autometer.com/signal-splitter-adapter-obd-ii.html

9

70.     The DLAPI was meant to work with DashLogic's own hardware, but the DLAPI was extended to work with the R3 temporarily (e.g. bug fixes for broken CAN functionality), until the time that AMP switched over to DashLogic provided hardware technology, as promised by AMP to DashLogic and required by the terms of the Contract.

71.     This switch never occurred, as promised.

72.     The OBD-II battery reset feature on the BVA-360, Hand-Held Battery & Electrical System Tester requires the use of an OBD-II interface (Prohibited Item 2).

73.     The BVA-360, Hand-Held Battery & Electrical System Tester currently uses an OBD-II interface[7], which is manufactured using the STN1110 OBD-II communications microchip from OBD Solutions, a DashLogic competitor, instead of using the communications microchip from DashLogic.

74.     The BVA-360, Hand-Held Battery & Electrical System Tester is advertised as an OBD-II product.

75.     The Operations Manual for the BVA-360, Hand-Held Battery & Electrical System Tester states that it is an OBD-II product.[8]

76.     The Auto Meter BVA-360 was released with OBD-II communications functionality after the execution date of the Contract.

77.     AMP has been coming to DashLogic for help with developing the OBD-II support in the BVA-360 for years. Each time, DashLogic made it clear that we would assist only if AMP stopped manufacturing competing products and started using DashLogic hardware for OBD-II

---

[7] Commonly referred to as the R3, potentially referred to as R3-I and/or R3-DAZ.
[8] Auto Meter BVA-360 - 2650-2006-77rA.pdf

connectivity starting with the very next customer order (which is already required under the terms of the Contract). AMP continued to promise DashLogic that AMP would use DashLogic hardware "next time", in order to get DashLogic's help and development expertise, and each time continued manufacturing competing devices, coming up with a new story as justification why they had to do so yet again.

78.    DashLogic actively worked on this project and did all of the preparation work to manufacture and package the R3 component of the BVA-360.

79.    AMP approved DashLogic's pre-existing OBD-II design, which is based on DashLogic's DL301 OBD-II USB interface design and cable.

80.    At AMP's request, DashLogic did the work to provide boxes, packaging, labels/stickers, and even custom-embroidered draw-string storage bags, for which AMP provided written approval to DashLogic, but never sent the promised purchase order.

81.    For the most recent BVA-360 order, AMP's own purchasing and materials managers emailed DashLogic, informing DashLogic that AMP was using DashLogic's direct competitor for the OBD-II communication chips, but that this competitor could not provide enough of the OBD-II communication chips.

82.    AMP then asked DashLogic to help AMP source additional OBD-II Communication Chips for the R3 from DashLogic's competitors.

83.    Of note, DashLogic had already offered and was ready to provide its own OBD-II Communication Chips.[9]

---

[9] Of note, this would have actually saved AMP money over what it was spending with DashLogic's competitors.

84.    On or about August of 2024 AMP's CEO confirmed to DashLogic, in writing, that AMP had entered into a contract that required AMP to provide an OBD II Communication Chip from DashLogic's direct competitor.

85.    The BVA-360 AMP provides uses an OBD-II Communication Chip of DashLogic's direct competitor, the STN1110 from OBD Solutions.

86.    Pursuant to the Contract, Prohibited Item 5 reads as follows:

| 5. | Motorcycle, ATV/Snowmobile, or watercraft related products for enthusiasts | Gathering and displaying performance or other data for motorcycle, ATV/Snowmobile, or watercraft vehicles. |
|----|----|----|

87.    Pursuant to the Contract, AMP is prohibited from providing any product for "gathering and displaying performance or other data for motorcycle, ATV/snowmobile, or watercraft vehicles.

88.    AMP provides no less than 53 different motorcycle gauges.

89.    The motorcycle gauges provided by AMP gather and display performance data for motorcycles.[10]

90.    AMP provides and sells multiple items that fall under the Prohibited Items portion of the Contract. Upon information and belief, some of these items were already being provided by AMP when it executed the Contract with DashLogic, meaning it was knowingly breaching the terms it was actively signing.

---

[10] https://www.autometer.com/gauges/pro-cycle.html

91.     AMP has materially breached the Contract.

92.     Pursuant to the Contract: "To the extent required or permitted by applicable law of the countries into which such Licensed Products are used, AMP and its Affiliates and sublicensees shall mark all Licensed Products in accordance with the applicable patent marking laws of such countries." §5.3.

93.     35 USC § 287 (a) requires that, in order to be protected from patent infringement, "the word 'patent' or the abbreviation 'pat.' together with the number of the patent" be affixed to the item or to the packaging of the item.

94.     AMP has not included this information on any of AMP's packaging of the Licensed Products under the Contract, or on AMP's website where the products can be purchased, or any other location that Plaintiff has looked.

95.     Pursuant to the Contract, both the Contract itself "and the license granted [t]hereunder shall terminate... thirty (30) days after [DashLogic] gives AMP written notice of any failure by AMP to pay any royalties due [t]hereunder, unless AMP has cured such breach during such thirty (30) day period."

96.     On March 26, 2025, DashLogic notified AMP, in writing and via UPS overnight courier, that there were unpaid royalties.

97.     Notice was delivered on March 27, 2025 at 8:33 am (Mountain Time), received by Pittenger, who signed for said notice having UPS tracking number 1Z7E2834280755333.

98.     AMP did not cure any breaches, including curing unpaid royalties, within 30 days as required.

99.    Pursuant to the plain terms of the Contract, both the Contract itself, and the license DashLogic granted to AMP thereunder, were terminated.

100.    Pursuant to the Contract, "all Licensed Technology transmitted to AMP by [DashLogic], materials prepared by AMP or generated by AMP which contain in any way Licensed Technology in any tangible form, and any copies thereof made by AMP will be destroyed or, at [DashLogic]'s written request, promptly returned to [DashLogic]" (hereinafter, the "Licensed Materials"). 7.3

101.    On or about March 16, 2025, DashLogic sent AMP a Notice of Termination via certified mail, pursuant to the terms of the Contract (the "Notice of Termination").

102.    In the Notice of Termination, and in several written communications thereafter, DashLogic demanded that AMP return the Licensed Materials, and all copies thereof, and other related items.

103.    AMP no longer has a license to use the Licensed Intellectual Property or to sell the Licensed Materials.

104.    AMP has refused to return the Licensed Materials to DashLogic as required by the Contract.

105.    AMP still lists the Licensed Materials for sale on its website.

106.    AMP's distributors are still selling the Licensed Materials.

107.    AMP is still providing the Licensed Materials to its distributors/retailers.

108.    AMP is still distributing DashLogic's proprietary configuration software utility through its website, for use with the aforementioned products.

109.    AMP has not informed its distributors that they can no longer sell the Licensed Materials, or that the Licensed Materials are no longer available.

## FIRST CAUSE OF ACTION
### Breach of Contract and Covenant of Good Faith and Fair Dealing

110.    Plaintiff incorporates by this reference the allegations set forth in each of the foregoing paragraphs as if fully set forth herein.

111.    On March 30, 2015, the parties entered into a License Agreement (the "Contract")

112.    The Contract constitutes a valid, binding, and legally enforceable contract under Utah law (collectively, the "Contract").

113.    DashLogic fully performed its obligations under the Contract by, among other things, providing the AMP with the license to use the Licensed Products.

114.    AMP, on the other hand, has not performed and instead has materially breached its obligations under the Contract by, among other things: (i) providing products with OBD II Communications Chips; (ii) providing OBD II Communications and passthrough interfaces and hardware; (iii) providing motorcycle gauges that gather and display performance data for motorcycles; (iv) failing to timely pay royalties; (v) failing to properly mark products with DashLogic's patent information; (vi) failing to return the Licensed Materials; continuing to provide the Licensed Materials without the license granted by the Contract.

115.    As a direct and proximate result of AMP's material breach of the Contract, DashLogic has been damaged in an amount to be proven at trial, but no less than $5,000,000.00, plus pre- and post- judgment interest, costs, and attorney fees.

116.    DashLogic is, therefore, entitled to relief as set forth below in the Prayer for Relief.

15

## SECOND CAUSE OF ACTION
**Breach of Covenant of Good Faith and Fair Dealing**

117.    Plaintiff incorporates by this reference the allegations set forth in each of the foregoing paragraphs as if fully set forth herein.

118.    The Contract constitutes a valid, binding, and legally enforceable contract under Utah law.

119.    Utah law imposes an implied covenant of good faith and fair dealing into every contract consummated in the State of Utah.

120.    AMP's repeated false promises to induce DashLogic to perform work to enable AMP to sell products, and then providing said products without using DashLogic's OBD II Communication Chips or Hardware, among other things.

121.    DashLogic performed under the Contract in good faith.

122.    As a direct and proximate result of AMP's material breaches of the covenant of good faith and fair dealing contained in the Contract, DashLogic has been damaged in an amount to be proven at trial, but no less than $5,000,000.00, plus pre- and post- judgment interest, costs, and attorney fees.

123.    The Plaintiff is, therefore, entitled to relief as set forth below in the Prayer for Relief.

## THIRD CAUSE OF ACTION
**Gross Negligence, Negligence, Negligent Misrepresentation**

124.    Plaintiff incorporates by this reference the allegations set forth in each of the foregoing paragraphs as if fully set forth herein.

125.    AMP had a duty to tell the truth, to make fair disclosure, and to prevent partial statements from being misleading or giving a false impression.

126.    AMP violated this duty by, among other things, making repeated false statements and promises to induce DashLogic to perform work to enable AMP to sell OBD II products, and then providing said products using the OBD II Communication Chips and/or Hardware Interfaces of DashLogic's direct competitors, among other things.

127.    AMP was in a better position than DashLogic to know the true facts, and had a financial interest in DashLogic's reliance thereon.

128.    AMP failed to use reasonable care and/or slight care to determine whether these statements representations were true, and made these statements and representations with a reckless indifference toward, and in disregard of, the rights of DashLogic.

129.    DashLogic reasonably relied on AMP's statements and representations and was thereby induced to act.

130.    As a direct and proximate result of AMP's gross negligence, negligence, and/or negligent misrepresentations, DashLogic has been damaged in an amount to be proven at trial, but no less than $5,000,000.00, plus pre- and post- judgment interest, costs, and attorney fees.

131.    The Plaintiff is, therefore, entitled to relief as set forth below in the Prayer for Relief.

### FOURTH CAUSE OF ACTION
**Fraud, Fraudulent Misrepresentation, Fraudulent Inducement**

132.    Plaintiff incorporates by this reference the allegations set forth in each of the foregoing paragraphs as if fully set forth herein.

133.    AMP made repeated false statements to DashLogic, including, among other things: a. requesting the DL302 design files under the premise of purchasing these from DashLogic, and then refusing to do so;  b. continually promising that they would purchase the R3 from DashLogic, thereby inducing DashLogic to perform additional work; c. continually approving DashLogic's work on the R3 and its various elements, and then adding additional components, such as a box or a bag, alleging these additional items needed to be completed before they could purchase from DashLogic; d. DashLogic presented to AMP the SensorTap P4 product which AMP informed DashLogic they intended to private label, and then AMP subsequently created their own CAN Bridge after having received a confidential diagram/overview from DashLogic for a future variant of the SensorTap product line which is very similar to the CAN Bridge, a prohibited item and directly in competition with the SensorTap.

134.    AMP either knew these statements and representations were false at the time they were made, or made these statements and representations recklessly, knowing that there was insufficient knowledge to do so.

135.    AMP made these statements and representations for the purpose of inducing DashLogic to act thereon.

136.    Acting reasonably, and in ignorance of the falsity of AMP's statements and representations, DashLogic relied thereon and was thereby induced to act thereon.

137.    As a direct and proximate result of AMP's actions, DashLogic has been damaged in an amount to be proven at trial, but no less than $5,000,000.00, plus pre- and post- judgment interest, costs, and attorney fees, as well as punitive damages.

138.    The Plaintiff is, therefore, entitled to relief as set forth below in the Prayer for Relief.

### FIFTH CAUSE OF ACTION
### Patent Infringemet

139.    Plaintiff incorporates by this reference the allegations set forth in each of the foregoing paragraphs as if fully set forth herein.

140.    Plaintiff owns certain Licensed Patents, Licensed Products, and Licensed Technology, including but not limited to the Driver Information and Alerting System, (collectively the "Licensed Intellectual Property Rights").

141.    The Contract has been terminated.

142.    AMP has neither license nor right to use, market, sell, or otherwise profit from DashLogic's Licensed Intellectual Property Rights.

143.    DashLogic demanded to AMP, in writing, to return all items that contain the Licensed Intellectual Property Rights, and to cease and desist all sales that included items that contain the Intellectual Property Rights.

144.    AMP refused to return items that contain the Licensed Intellectual Property Rights.

145.    AMP continues to sell (currently marked out-of-stock), and to provide to its distributors, items that contain the Licensed Intellectual Property Rights.

146.    AMP has no right to sell or otherwise provide items that contain DashLogic's Licensed Intellectual Property Rights.

147.    As a direct and proximate cause of AMP's Patent Infringement, DashLogic has been damaged in an amount to be proven at trial, but no less than $5,000,000.00, plus pre- and post- judgment interest, costs, and attorney fees, as well as punitive damages.

148.    The Plaintiff is, therefore, entitled to relief as set forth below in the Prayer for Relief.

## SIXTH CAUSE OF ACTION
### Declaratory Judgment and Injunctive Relief

149.    Plaintiff incorporates by this reference the allegations set forth in each of the foregoing paragraphs as if fully set forth herein.

150.    Pursuant to the Utah Declaratory Judgment Act, the Court has the power to "issue declaratory judgments determining the rights, status, and other legal relations." See Utah Code Ann. § 78B-6-401(1).

151.    Plaintiffs have a legally protectable interest in the accurate interpretation and proper enforcement of the Contract and protection of their patents.

152.    A justiciable controversy exists between the parties concerning the Contract and the protection of Plaintiff's Patents.

153.    Plaintiffs' interests are adverse to Defendants' interests.

154.    The issues are ripe for judicial determination.

155.    Plaintiffs are entitled to judicial relief to resolve the controversy created by the dispute between Plaintiffs and Defendants.

156.    Particularly, Plaintiffs are entitled to seek from the Court at least the following declarations, injunctive relief, and related declarations as necessary to vindicate Plaintiffs' rights and resolve the actual dispute and controversy between the parties:

    a.    DashLogic owns the Licensed Intellectual Property Rights, and all items that relate to or contain the Licensed Intellectual Property Rights.

    b.   AMP has no right to or interest in DashLogic's Licensed Intellectual Property Rights.

    c.   AMP cannot offer, provide, sell, or otherwise benefit from DashLogic's Licensed Intellectual Property Rights.

    d.   AMP cannot offer, provide, or sell, items that contain DashLogic's Licensed Intellectual Property Rights or relate to DashLogic's Intellectual Property Rights.

    e.   AMP cannot offer, provide, or sell items prohibited by the Contract.

    f.   AMP must strip the DLAPI from any and all products, including but not limited to the BVA-360, and cease all use of the DLAPI, items that contain the DLAPI, and any and all data resulting from the use of the DLAPI.

    g.   AMP shall not use, provide, sell, or otherwise offer the DLAPI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment against Defendants on each of the foregoing causes of action and for all available additional relief as follows:

1.    Judgment in favor of DashLogic and against Defendants on all claims and defenses asserted in this action;

3.    Actual damages in favor of DashLogic and against Defendants, jointly and severally, in an amount equal to not less than $5,000,000.00;

4.    For Declaratory Judgment as follows:

    a.   DashLogic owns the Licensed Intellectual Property Rights, and all items that relate to or contain the Licensed Intellectual Property Rights.

21

b. AMP has no right to or interest in DashLogic's Licensed Intellectual Property Rights.

c. AMP cannot offer, provide, sell, or otherwise benefit from DashLogic's Licensed Intellectual Property Rights.

d. AMP cannot offer, provide, or sell, items that contain DashLogic's Licensed Intellectual Property Rights or relate to DashLogic's Intellectual Property Rights.

e. AMP cannot offer, provide, or sell items prohibited by the Contract.

f. AMP must strip the DLAPI from any and all products, including but not limited to the BVA-360, and cease all use of the DLAPI, items that contain the DLAPI, and any and all data resulting from the use of the DLAPI.

g. AMP shall not use, provide, sell, or otherwise offer the DLAPI.

5. For pre- and post- judgment interest accruing at the statutory rate;

6. For reasonable attorney fees and costs as allowed under the Contract and by law;

7. For punitive damages; and

8. For such other and further relief to which Plaintiff is entitled at law or in equity.

DATED this 24th day of August, 2025.

FREEMAN LOVELL, PLLC

/s/ *Krystaly N. Koch*
Krystaly N. Koch
*Attorney for Plaintiff*

## **VERIFICATION**

I, Brian Palmer, declare that the matters stated in the above Verified Complaint are within my personal knowledge or are based upon my review of the records kept in the regular course of Plaintiff's business. Based upon the information so obtained and compiled, which I believe to be accurate, I believe the facts stated in the foregoing Verified Complaint are true and correct and are based on a reasonable inquiry, and I make this verification to the best of my information and belief. I declare under criminal penalty under the law of Utah that the foregoing is true and correct.

EXECUTED this 24th day of August, 2025.

*/s/ Brian Palmer*
Brian Palmer
DashLogic, Inc.
*\* Signed electronically with written permission*

23